UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
FASTENER DIMENSIONS, INC., DARRYL       :      12cv8918 (DLC)
HINKLE, DARRYL HINKLE as TRUSTEE of     :
FASTENER DIMENSIONS, INC. PROFIT        :
SHARING PLAN, and KATHLEEN HINKLE,      :
                                        :
                    Plaintiffs,         :
                                        :
            -v-                         :
                                        :
MASSACHUSETTS MUTUAL LIFE INSURANCE      :
COMPANY, MASSMUTUAL HOLDING LLC, MML     :
INVESTORS SERVICES, LLC, FIFTH AVENUE    :
FINANCIAL, COWAN FINANCAL GROUP,         :
STERLING TRUST, EQUITY TRUST COMPANY,    :
DANIEL TUMMINIA, MICHAEL FEUER, DENNIS   :
MANNARINO, MASSMUTUAL CONTRACTING        :
CORP., CYPRESS LAWN CARE, J&D ITALIAN    :
SPECIALTY MEATS, ESTATE OF JANICE BOHA,  :
and DOES 1-10,                          :
                    Defendants.         :
                                        :
----------------------------------------X
INNA IPPOLITOV, individually and as      :      13cv4782 (DLC)
representative of beneficiaries of the   :
pension and/or profit sharing plans of   :
Fastener Dimensions, Inc.,              :
                                        :
                    Plaintiff,          :      OPINION & ORDER
                                        :
            -v-                         :
                                        :
FASTENER DIMENSIONS, INC., DANIEL        :
TUMMINIA, MICHAEL FEUER, DARRYL HINKLE,  :
MASS MUTUAL CONTRACTING CORP., CYPRESS   :
LAWN CARE, J&D ITALIAN SPECIALTY MEATS,  :
"JOHN DOES" 1 through 10, and "JANE      :
DOES" 1 through 10,                     :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

DENISE COTE, District Judge:

These consolidated cases, now settled, concerned the alleged mismanagement of a retirement fund created for the benefit of the employees of Fastener Dimensions, Inc. ("Fastener"). Before the Court is the August 22, 2014 motion by plaintiff Inna Ippolitov ("Ippolitov") and thirteen other putative beneficiaries of Fastener's Pension and Profit Sharing Plan (the "Ippolitov Plaintiffs" and the "Plan," respectively) for an award of attorney's fees for their counsel Irina Shpigel ("Shpigel") and for a "case contribution award" to Ippolitov. For the reasons stated below, Shpigel is awarded $6,000 and judgment is reserved as to reimbursement of Ippolitov for legal fees pending the subsequent submission of documentary evidence about such payments.

**BACKGROUND**

## I.   Facts Alleged by Complaints

The complaints in the above-captioned actions allege as follows. Fastener is a New York corporation that supplies fasteners and hardware for military aircraft, particularly helicopters. In 1992, Fastener established two pension and profit-sharing plans for its employees, which were eventually merged to become the Plan. In 2000 or 2001, Darryl Hinkle ("Hinkle"), Fastener's president, hired Daniel Tumminia ("Tumminia") to manage the Plan and its life insurance policies

and investments.  Tumminia, acting with co-conspirators including Michael Feuer ("Feuer"), Dennis Mannarino ("Mannarino"), and Janice Boha ("Boha"), stole from the Plan; Tumminia, Feuer, and Mannarino have pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

Boha died in 2012.  Before her death, it is alleged that she used Plan funds to take out a life insurance policy with Massachusetts Mutual Life Insurance Co. ("MassMutual").  The proceeds of this policy and a second MassMutual life insurance policy insuring Boha, which then equaled $920,488.76, were paid into the Court on April 25, 2013 (the "Interpleader Funds").

## II. Procedural History

### A.    These Actions Are Filed and Consolidated.

Fastener, Hinkle (acting both individually and as trustee of the Plan), and his wife Kathleen Hinkle filed the first of the above-captioned actions in this district on December 7, 2012.  Fastener Dimensions, Inc. v. Mass. Mutual Life Ins. Co., 12cv8918 (DLC) (the "Fastener Action").  The Fastener Action included a variety of state common-law claims as well as claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").  These were brought against Tumminia, Feuer, Mannarino, and Boha's estate, certain companies they controlled, as well three sets of institutions: MassMutual; Fifth Avenue Financial and Cowan Financial Group (the "FAF/Cowan

Defendants"); and Sterling Trust and Equity Trust Company (the "Sterling Defendants").

Ippolitov filed the second of the above-captioned actions, Ippolitov v. Fastener Dimensions, Inc., 13cv4782 (DLC) (the "Ippolitov Action"), on April 30, 2013, in the Eastern District of New York, through a man purporting to be an attorney named Stephen G. Dickerman ("Dickerman").[1]  Ippolitov brought suit on behalf of herself and as representative of a purported class composed of beneficiaries of the Plan, and brought claims similar to those advanced in the Fastener Action under RICO and state common law, as well as claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA").  Unlike the Fastener Action, which was brought by Fastener and Hinkle, the Ippolitov Action included Fastener and Hinkle as defendants, alleging that Hinkle was another co-conspirator.

On June 24, MassMutual filed a motion to transfer the Ippolitov Action to this district, arguing that it was closely related to the Fastener Action.  The transfer motion was opposed by Hinkle and Fastener.  Ippolitov failed to respond.  On July

---

[1] As explained below, Dickerman was subsequently arrested and is now awaiting trial on charges of impersonating the real Stephen G. Dickerman and practicing law under that man's license for several years.  In this Opinion, "Dickerman" refers to the man who purported to act as Ippolitov's attorney, not the real Stephen G. Dickerman.

10, 2013, the transfer motion was granted, and this Court accepted the <u>Ippolitov</u> Action as related to the <u>Fastener</u> Action.

Following an opinion on motions to dismiss in the <u>Fastener</u> Action, Ippolitov filed an Amended Complaint on September 3, 2013.  The Amended Complaint alleged breach of fiduciary duty in violation of ERISA, as well as a number of state common-law claims.

**B.   Motions to Dismiss in <u>Ippolitov</u>**

On October 3, 2013, defendant Mannarino filed a motion to dismiss for lack of personal jurisdiction because Ippolitov had failed to serve him with process.  Ippolitov's counsel did not oppose the motion.  In an opinion of December 12, 2013, the Court noted that Mannarino's counsel had "personally brought th[at] motion to Mr. Dickerman's attention," that Mannarino had been properly served in the <u>Fastener</u> Action, and that there was no indication Mannarino was attempting to evade service. Accordingly, on December 11, the Court dismissed the <u>Ippolitov</u> Action as to Mannarino, without prejudice.  The Court noted in that Order that "Mr. Dickerman's failure to serve Mannarino or to oppose the October 3 motion is very much in line with his dilatory conduct over the course of this litigation thus far."

On October 11, MassMutual as well as Fastener, Hinkle, and his wife (the "Fastener Plaintiffs") moved to dismiss certain claims; Ippolitov opposed.  On December 12, MassMutual's motion

was granted in full and the Fastener Plaintiffs' motion was granted in part.

### C.  The <u>Ippolitov</u> Notice of Pendency

On January 13, 2014, the Court approved a notice to alert the beneficiaries of the Plan to the pendency of the <u>Ippolitov</u> Action and provide them an opportunity to join the suit (the "Notice of Pendency").  On January 16, counsel for Ippolitov filed the final notice, which states, "[I]f plaintiffs win their claims in this lawsuit, Mr. Dickerman will ask the Court to be compensated based on a reasonable percentage of the total benefits to the beneficiaries that he represents."  Thirteen putative beneficiaries joined the suit and consented to be represented by Dickerman.

### D.  Recurring Issues in the Representation of Ippolitov

From the very beginning of this consolidated litigation, Ippolitov's counsel have shown a lack of diligence.  A pretrial conference was held on August 15, 2013, which was to be the first to address the <u>Fastener</u> Action together with the recently transferred <u>Ippolitov</u> Action.  Dickerman requested an adjournment, which was denied.  He then chose not to appear at the conference.  At the pretrial conference, counsel for the other parties in these cases explained to the Court that Dickerman had for months been neglecting his responsibilities in connection with these cases.  An Order to Show Cause was issued

on August 15 setting a hearing for August 16 to determine if
Dickerman should be sanctioned.  Dickerman failed to appear at
the August 16 hearing.  Accordingly, on August 16 Dickerman was
sanctioned for his willful failure to appear at the August 15
pretrial conference.  The Court also ordered Dickerman to show
cause why the Ippolitov Action should not be dismissed for
failure to prosecute.  Dickerman subsequently appeared and
satisfied the Court, which did not dismiss the action.

     As noted above, Dickerman failed to serve Mannarino in the
Ippolitov Action, even after Mannarino's counsel reached out to
him.  Dickerman then chose not to oppose Mannarino's motion to
dismiss, which was subsequently granted.

     Although defendant Tumminia was served, Tumminia failed to
answer or otherwise respond to the complaint.  Tumminia's
deadline for answering was, at the latest, October 3, 2013.
Four months passed, but Dickerman took no action.  On January
28, 2014, the Court, sua sponte, entered an Order directing
Dickerman to file an Order to Show Cause for default judgment by
February 7 if Ippolitov wished to continue to prosecute the
claims against Tumminia.

     Also on January 28, the Court entered an Order noting that
Ippolitov had failed to file affidavits of service on four
defendants (the "Unserved Defendants"), although the window in
which to effect service had closed weeks before.  The Order

directed Ippolitov to file affidavits of service by February 7
or a submission showing good cause why the Ippolitov Action
should not be dismissed pursuant to Federal Rule of Civil
Procedure 4(m) as to those defendants.

February 7 came and went; Dickerman filed none of these
documents.  On February 11, the Court's staff left a message for
Dickerman.  On February 12, Dickerman requested an extension of
time to comply with the January 28 Orders, explaining he and his
associate overlooked the e-mail alerts regarding those Orders.
On February 14, the Court dismissed the Ippolitov Action without
prejudice as to the Unserved Defendants and granted Dickerman an
extension until February 21 to file an Order to Show Cause for
default as to Tumminia.  Only at that point did Dickerman file
the Order to Show Cause as to Tumminia.

Perhaps most troubling, on July 23, 2014, Dickerman wrote
the Court to advise that Steven Larsen ("Larsen"), who had
signed a notice of consent to join the Ippolitov Action and whom
Dickerman agreed to represent, had never been an employee of
Fastener and had no connection whatever to the Plan.  The Court
instructed Dickerman to submit a "detailed affidavit explaining
how he came to list Steve Larsen as a client."  Dickerman's
affidavit simply states that Larsen shared the name of a former
Fastener employee, that Larsen submitted a notice of consent
that had been mailed to him with the Notice of Pendency, and

that Dickerman's office had "contacted Mr. Larsen on numerous occasions regarding this lawsuit and the Fastener Plans to request documents . . . relating to his employment at Fastener . . . or regarding the Fastener Plans."  Dickerman did not claim to have conducted any diligence before accepting Larsen as a client; nor did he so much as claim that Larsen told him or Shpigel that Larsen had any connection to Fastener or the Plan.

### E.   Settlement

The parties settled just before the close of fact discovery, scheduled for July 31, 2014.  On July 29, the Court so-ordered the Stipulation and Agreement of Settlement ("Settlement") of all parties to the Fastener and Ippolitov Actions.  The Settlement provides for a payment to the Plan of $600,000 less certain expenses (the "Fund"), with $245,000 to be paid from the Interpleader Funds and the balance by MassMutual. The Fund, less any attorney's fees awarded to Ippolitov's counsel or case contribution award granted to Ippolitov by the Court, is to be "distributed on a pro-rata basis to all vested Plan participants," under the supervision of an independent fiduciary.  In addition to the release of claims by the fourteen Ippolitov Plaintiffs, the Settlement includes releases signed by nineteen current Fastener employees and one former Fastener employee.  A further $600,000 is to be paid to the Fastener Plaintiffs, with $375,000 from the Interpleader Funds and the

balance from the FAF/Cowan Defendants.

### F.   Counsel's Contributions to this Result

Time and again, it has been counsel for defendant MassMutual who has acted for the parties to ensure the efficient progress of this litigation.  For instance, it was counsel for MassMutual who moved to transfer the <u>Ippolitov</u> Action to the Southern District as related to the <u>Fastener</u> Action; who proposed schedules for MassMutual's and the Fastener Plaintiffs' motions to dismiss; who raised the parties' joint requests for scheduling adjustments; who requested leave for the parties to depose then-incarcerated defendant Tumminia; who reported the result of the parties' meet-and-confers; who wrote to request a stay as the parties neared settlement; and who filed the Settlement with the Court.

Among plaintiffs' counsel, it was counsel for the Fastener Plaintiffs who took the laboring oar.  As Fastener Plaintiffs state in their opposition to the instant motion, the "majority" of their interactions with Ippolitov's counsel were not with Dickerman, but with his associate Shpigel.  According to Fastener Plaintiffs, Shpigel "produced little to no documents from her clients," "engaged in little to no questioning of the witnesses at the depositions she attended," and "relied almost entirely on the negotiations of Fastener counsel on behalf of the Plan . . . and the data and analysis of Fastener's expert to

calculate damages to her clients." Shpigel elected not to put in a reply to dispute this, and it is in accord with the Court's own observations about the parties' relative engagement.

   **G.  Dickerman Is Arrested and Shpigel Appears.**

   As of the date of the Settlement, Dickerman was Ippolitov's sole attorney of record. On August 6, a criminal complaint against Dickerman was unsealed, charging that he had been impersonating the real Stephen G. Dickerman, an attorney, for several years, and that the real Mr. Dickerman has never appeared as an attorney in the Southern District of New York. "Dickerman" was arrested and is now awaiting trial.

   On August 18, 2014, Shpigel entered a notice of appearance for the Ippolitov Plaintiffs. Unaware that Dickerman was an impostor, Shpigel worked as his legal associate from February 20, 2013 until April 27, 2014. During that time, Shpigel received a base weekly salary of $1,000, "supplemented by fees [she] earned working on contingency cases." On April 27, she entered into a partnership agreement with Dickerman and another attorney to form the law firm Dickerman, Kahn, & Shpigel, LLC, which was never incorporated. According to a declaration Shpigel recently filed in another case, the operating agreement for that partnership continued to "refer[] to [Shpigel] as an associate," and allocate to her 15% or less of the firm's profits, depending on the mix of cases. Shpigel Decl. of Sept.

10, 2014, <u>Zap Cellular, Inc. v. Cynnamon</u>, 14cv2858, Dkt. No. 17
¶ 6 (E.D.N.Y.).

Since the inception of the <u>Ippolitov</u> Action, Shpigel did
much of the work on that matter for Dickerman.  Shpigel
represents that she "ha[s] served as primary counsel for
Plaintiffs in this litigation."

**H.    Shpigel's Experience**

According to Shpigel, she was admitted to the New York bar
in April of 2009 and was admitted to practice in the Southern
District of New York in March of 2014.  After graduating from
Albany Law School, she served as a "law clerk/assistant" in the
firm of Schoengold, Sporn, Laitman & Lometti, a firm that
specializes in complex commercial litigation.  There, she
reports that she "assisted in the research and drafting of the
complaint in [a] class action lawsuit" alleging
misrepresentations and omissions in connection with a security
offering.  Shpigel left Schoengold to open a solo practice at an
unspecified date.  From 2009 to 2012, she was "of counsel" to
Taylor & Mrsich, LLP, a law firm specializing in corporate and
intellectual property law.

As noted above, on February 20, 2013, Shpigel became an
associate for Dickerman.  While an associate, she reports she
was the "lead attorney" in <u>Zap Cellular, Inc. v. Cynnamon</u>,
14cv2858 (E.D.N.Y.), in which she "secured a settlement of

$1,100,000." According to the public docket, Shpigel appeared in that action after Dickerman was arrested.

## I. The Instant Motion for Fees

On August 22, Shpigel filed the Ippolitov Plaintiffs' motion for an attorney's fee award for Shpigel's work on the case and a case contribution award to Ippolitov (the "Fee Motion"). Attached to the Fee Motion is a declaration from Shpigel (the "Shpigel Declaration"), an "Attorney Biography" for Shpigel, and itemized time entries for time Shpigel worked on the Ippolitov Action. On August 28, the Fastener Plaintiffs filed a memorandum of law in opposition to the Fee Motion. The Ippolitov Plaintiffs elected not to file a reply, which was due September 4.

Shpigel requests a fee award of $129,080, equal to 368.8 hours of work multiplied by an hourly rate of $350, and a $10,000 award to Ippolitov to compensate her for a retainer paid to Dickerman. As noted above, Shpigel was an associate for Dickerman until April 27, 2014, during which time Shpigel was paid a weekly salary of $1,000. In the memorandum of law in support of the Fee Motion, Shpigel acknowledges that she did not pay any overhead while working on this case. She also states in her declaration that Ippolitov paid $10,000 to Dickerman at the commencement of the Ippolitov Action and avers, on information and belief, that no other fee was paid to Dickerman. No

documentation of Ippolitov's payment has been submitted to the Court, and Shpigel does not state the basis for her assertion.

Shpigel calculates that her fee request is equal to 22% of the $600,000 to be paid to the Plan under the Settlement. Although Dickerman, in the notice of pendency Shpigel worked on and mailed to Plan beneficiaries, represented that he was to be compensated based on "reasonable percentage of the total benefits to the beneficiaries that he represents," Shpigel does not advise the Court of her fourteen clients' share of the $600,000 (less any attorney's fee or case contribution award). In their memorandum of opposition to the Fee Motion, the Fastener Plaintiffs claim that "the majority" of the $600,000 is to go to Plan beneficiaries other than the Ippolitov Plaintiffs.

**DISCUSSION**

## I.   Legal Standards

The common fund doctrine provides that "a party that secured a fund for the benefit of others, in addition to himself, may recover his costs, including his attorney's fees, from the fund itself or directly from the other parties enjoying the benefit." In re Holocaust Victim Assets Litig., 424 F.3d

150, 156-57 (2d Cir. 2005) (citation omitted).[2,3]  This doctrine "has deep roots in equity," and in particular in unjust enrichment: "To allow others to obtain full benefit from the plaintiff's efforts without contributing to the litigation expenses . . . would be to enrich the others unjustly at the plaintiff's expense." U.S. Airways, Inc. v. McCutchen, 133 S. Ct. 1537, 1547 (2013) (citation omitted).  Even non-lead counsel, if their work has conferred "substantial benefit" to plaintiffs, are eligible to recover reasonable fees from the common fund.  Victor v. Argent Classic Convertible Arbitrage Fund LP, 623 F.3d 82, 87 (2d Cir. 2010).  The court is to "act as a fiduciary who must serve as a guardian of the rights of absent" fund beneficiaries, and must conduct a "searching assessment" of any fee request.  McDaniel v. Cnty. of

---

[2] Because the Ippolitov Plaintiffs seek to recover from the $600,000 Fund earmarked for the Plan, rather than from defendants, they rely on the common fund doctrine rather than ERISA's fee-shifting provision, 29 U.S.C. § 1132(g)(1).

[3] ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), is not a bar to recovery from the common fund in this case, as the "common fund[] [was] financed by parties other than the plan[] at issue, and the fund[] [itself] was never designated as vested pension benefits -- rather, [it was] general settlement funds that allowed for . . . payment of attorney's fees out of the common fund."  Kickham Hanley PC v. Kodak Retir. Income Plan, 558 F.3d 204, 213 (2d Cir. 2009) (explaining that a "contested pension claim," arising under a settlement agreement, is excepted from the anti-alienation provision and "may be knowingly and voluntarily released as part of a settlement resolving an actual or potential dispute over pension benefits").

Schenectady, 595 F.3d 411, 419 (2d Cir. 2010) (citation omitted).

In common fund cases, a reasonable attorney's fee may be calculated under either the "lodestar" method or the "percentage of the fund" method.  Id. at 417.  The "lodestar" is "the product of a reasonable hourly rate and the reasonable number of hours required by the case -- which creates a presumptively reasonable fee."  Stanczyk v. City of New York, 752 F.3d 273, 284 (2d Cir. 2014) (citation omitted).  The lodestar may then be modified if it "does not adequately take into account a factor that may properly be considered in determining a reasonable fee."  Millea v. Metro-North R.R. Co., 658 F.3d 154, 167 (2d Cir. 2011) (quoting Perdue v. Kenny A., 559 U.S. 542, 554 (2010)).  The percentage-of-fund method assigns an attorney some reasonable percentage of the fund established.  McDaniel, 595 F.3d at 418.  "[T]he trend in this Circuit is toward the percentage method," but each method has its limitations.  Id. at 417.  The percentage method may tend to overcompensate plaintiffs where there is not a "substantial contingency risk" and the percentage method would result in fees "many times greater than those that would have been earned under the lodestar" method.  Id. at 418-19.  Even where the percentage method is used, courts are encouraged to examine the lodestar calculation as a "cross check on the reasonableness of the

16

requested percentage." <u>Victor</u>, 623 F.3d at 88 (citation
omitted).

The lodestar figure is to be calculated using "market rates
in line with those rates prevailing in the community for similar
services by lawyers of reasonably comparable skill, experience,
and reputation." <u>Reiter v. MTA New York City Transit Auth.</u>, 457
F.3d 224, 232 (2d Cir. 2006) (considering fee award in Title VII
case) (citation omitted).  Pursuant to the "forum rule," "courts
should generally use the hourly rates employed in the district
in which the reviewing court sits in calculating the
presumptively reasonable fee." <u>Simmons v. New York City Transit
Auth.</u>, 575 F.3d 170, 174 (2d Cir. 2009) (considering fee award
in Americans with Disabilities Act case) (citation omitted).  An
out-of-district rate, or a rate based on "case-specific
variables," may be applied where "it is clear that a reasonable,
paying client would have paid . . . higher rates." <u>Id.</u>
(citation omitted).  Where a "lawyer filed suit in his home
district, and the case was transferred to the forum district"
for the convenience of the parties, "counsel would normally be
entitled to fees at the rate prevailing in his home district."
<u>Polk v. New York State Dep't of Correctional Servs.</u>, 722 F.2d
23, 25 (2d Cir. 1983) (considering Section 1988 fee award);
<u>accord</u> <u>A.R. v. New York City Dep't of Educ.</u>, 407 F.3d 65, 81 (2d

Cir. 2005) (citing Polk).

A court applying the percentage-of-fund method is to select a reasonable percentage "based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund." McDaniel, 595 F.3d at 426 (citation omitted).  Common fund awards must be "made with moderation," as a court is to act as a fiduciary for the absent beneficiaries.  Goldberger v. Integrated Res., Inc., 209 F.3d 43, 52 (2d Cir. 2000); see McDaniel, 595 F.3d at 419.

Under either the lodestar method or the percentage-of-fund method, the Court is to consider the six Goldberger factors to determine whether a fee award would be reasonable.  McDaniel, 595 F.3d at 423 (citing Goldberger, 209 F.3d at 50).  These factors are:

(1)  counsel's time and labor;

(2)  the litigation's magnitude and complexity;

(3)  the risk of the litigation;

(4)  the quality of representation;

(5)  the requested fee in relation to the settlement; and

(6)  public policy considerations.

Id.

## II.  Shpigel's Fee Request

### A.  Percentage-of-Fund Method

Shpigel has conferred upon the Plan beneficiaries a

substantial benefit -- but just barely.  While Fastener
Plaintiffs purported to bring suit on behalf of the Plan, their
individual claims brought them into conflict with the Plan
beneficiaries, in particular as to their claim to the
Interpleader Funds, which Hinkle had claimed were due to him,
personally, and the Ippolitov Plaintiffs contended were owed to
the Plan.  Under the Settlement, the Interpleader Funds are
split among Boha's estate, the Fastener Plaintiffs, and the
Plan.  Shpigel's mere presence helped to safeguard the Plan's
interests where they conflicted with the Fastener Plaintiffs'.
Even the Fastener Plaintiffs, who were often adversarial with
the Ippolitov Plaintiffs, concede that Shpigel "passably
represented her clients."  Accordingly, under the common fund
doctrine, Shpigel is entitled to some reasonable fee.

        Here, an award of 1% of the Fund -- $6,000 -- is reasonable
under the Goldberger factors.  First, as to Shpigel's time and
labor, she was on salary until April 27, 2014, when she entered
into a partnership agreement with Dickerman.  Only work from
that point on -- which she calculates as 148.95 hours -- was
uncompensated and subject to contingency.  On the whole, the
Court finds that Shpigel's time entries are inflated and include
work better suited for support staff.  For example, Shpigel
recorded 19 hours for searching and organizing Fastener
employees' addresses, and 15.5 hours in connection with a simple

Order to Show Cause for default against a defendant who had
failed to answer.  Shpigel also recorded time for some matters
that do not support a fee, including responding to Dickerman's
arrest (3.4 hours) and responding to the discovery that Larsen,
whom she and Dickerman represented, had never worked for
Fastener and had no claim to benefits from the Plan (1.5 hours).

After a careful review of Shpigel's time entries, the Court
finds that they should be reduced across the board by 25%.  See
Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998)
("Hours that are excessive, redundant, or otherwise unnecessary
are to be excluded, and in dealing with such surplusage, the
court has discretion to deduct a reasonable percentage of the
number of hours claimed as a practical means of trimming fat
from a fee application.") (citation omitted).  This reduces the
number of uncompensated hours billed to 111.7, which is a
relatively small number.  As described below in the lodestar
cross-check, Shpigel's hours worked confirm the reasonableness
of a $6,000 award.

Second, the Ippolitov Action was not particularly large or
complex.  Tumminia, Feuer, and Mannarino had already been
convicted, and the Fastener Plaintiffs had already filed a civil
complaint alleging the relevant facts and raising most of the
claims borrowed by Dickerman and Shpigel in the Ippolitov
complaint.  Dickerman and Shpigel brought the Ippolitov Action

as a tag-along to the Fastener Action, and left the heavy-lifting to Fastener Plaintiffs' counsel.  Although expert discovery may have become complex, the litigation ended before that point, and there is no reason to believe that the Fastener Plaintiffs would not have taken on the bulk of that work, as they did with the damages expert used during settlement negotiations.

Third, as for the risk of litigation, there was relatively little risk here.  Again, Tumminia, Feuer, and Mannarino had already been convicted for the misconduct alleged; MassMutual and the FAF/Cowan Defendants both have deep pockets; and Interpleader Funds totaling nearly $1 million had been paid into Court.  In addition, Ippolitov avers that Dickerman received $10,000 from Ippolitov at the start of the suit, and Shpigel was working on salary for Dickerman until April 27, 2014.  As noted above, Shpigel was free to rely on the work of Fastener Plaintiffs; if a positive result appeared unlikely, Shpigel had not obligated herself to do much additional work.  All things considered, Shpigel undertook relatively little risk here.

Fourth, the quality of Ippolitov's representation has been remarkably poor.  Although some of this is chargeable to Dickerman rather than Shpigel, Shpigel represents that she was, in fact, "primary counsel for Plaintiffs in this litigation," and indeed she entered into a partnership agreement with

Dickerman in April 2014.  Dickerman was sanctioned for refusing
to attend a pretrial conference, other counsel complained about
his lack of attention to this case, and an Order to Show Cause
was issued requiring Dickerman to convince the Court the
Ippolitov Action should not be dismissed for failure to
prosecute.  Defendant Mannarino was never served with process in
the action -- even after his counsel contacted Dickerman about
service -- and Dickerman and Shpigel elected not to oppose
Mannarino's motion to dismiss on that ground, which was
consequently granted.  Similarly, Dickerman and Shpigel failed
to respond to the Court's Order concerning the four Unserved
Defendants, and accordingly the Ippolitov Action was dismissed
as to them.  Finally, Dickerman and Shpigel's diligence with
respect to Larsen was so wanting that they inserted him into the
action without realizing that he had not worked for Fastener,
and thus had nothing whatever to do with this case.

Apart from these missteps, Dickerman and Shpigel added
little to this litigation.  Shpigel chose not to put in a reply
to refute the Fastener Plaintiffs' claim that Shpigel "produced
little to no documents from her clients," "engaged in little to
no questioning of the witnesses at the depositions she
attended," and "relied almost entirely on the negotiations of
Fastener counsel on behalf of the Plan . . . and the data and
analysis of Fastener's expert to calculate damages to her

22

clients."  On the whole, the quality of Shpigel's representation has been extremely poor.

Fifth, a $6,000 award, 1% of the $600,000 Fund, is appropriate as a percentage of the Fund.  The percentage-of-fund award given to lead counsel in ERISA class actions is often between 15% and one-third of the class recovery.  See In re Colgate-Palmolive Co. ERISA Litig., --- F. Supp. 2d ---, 2014 WL 3292415, at *4 (S.D.N.Y. July 8, 2014) (noting two studies have found the median award in common fund ERISA cases to be 25% and 28%); In re Marsh ERISA Litig., 265 F.R.D. 128, 146-47 (S.D.N.Y. Jan. 29, 2010) (awarding 33.3% of fund); In re Worldcom, Inc. ERISA Litig., 2005 WL 3116188, at *8 (S.D.N.Y. Nov. 22, 2005) (awarding 20%).  Here, Shpigel contributed very little -- in an amount approximated by the ratio of a 1% award to a typical double-digit award -- to the creation of the Fund, and an award in that amount is appropriate.  Cf. Victor, 623 F.3d at 84, 89-90 (affirming district court that rejected non-lead counsel's request for fees greater than the lodestar fee allocated by lead counsel, which was equal to less than one-third of one percent of the settlement funds).

Given Dickerman and Shpigel's lack of engagement with this action and a troubling lack of diligence throughout, as well as the unrebutted representation by Fastener Plaintiffs -- fully in keeping with the Court's own observations -- that Shpigel

contributed very little to the Settlement, 1% appropriately
measures the benefit created by Dickerman and Shpigel's mere
appearance in this action on behalf of the Plan beneficiaries.

Sixth, public policy considerations favor a very modest
award here.  While the protection of retirement funds is a great
public interest and private attorneys general have a major role
to play in ERISA litigation, the Ippolitov Action was a tag-
along action filed by a man posing as an attorney.  The filing
of tag-along actions by counsel who intend to do little to
prosecute the case should not be encouraged, as they tend to
slow the litigation and create needless duplication among
plaintiffs' counsel.  Suits by counsel unwilling to engage with
litigation and provide diligent representation should especially
be discouraged, as it does little to benefit plaintiffs and
introduces myriad issues -- like those surrounding Dickerman's
failure to attend the August 15, 2013 pretrial conference, and
Dickerman and Shpigel's failure to serve five defendants -- that
waste the other parties' time, as well as the time of this
Court.  Finally, any award given will be taken from the Plan
beneficiaries, and the Court is to jealously guard their rights.
Where Shpigel did extremely little to further this litigation
and reach this Settlement, the Plan beneficiaries, not Shpigel,

should enjoy the vast majority of the Fund.

>    **B.   Lodestar Cross-Check**

A cross-check against the lodestar figure confirms the reasonableness of a $6,000 award.  As noted above, after the reductions described above, Shpigel reasonably billed 111.7 hours for which she was not compensated by Dickerman.  For the reasons set out below, a reasonable hourly rate for Shpigel's work is $100, which produces a lodestar figure of $11,700 before any adjustment.

In her declaration, Shpigel represents that $350 is her "current billing rate[]," but submits no further evidence of this.  Shpigel practices in the Eastern District of New York, and the Ippolitov Action was filed there and only transferred to the Southern District for the convenience of the parties, because the related Fastener Action was pending here.  In the Eastern District of New York, courts have awarded $200-$300 for senior associates and $100-$200 for junior associates in ERISA suits and similar cases.  See Trs. of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation, Pension & Welfare Funds v. Thalle/Transit Constr. Joint Venture, 2014 WL 5343825, at *3 (Oct. 20, 2014 E.D.N.Y.); accord Flanagan v. N. Star Concrete Const., Inc., 2014 WL 4954615, at *11 (E.D.N.Y. Oct. 2, 2014); Carrasco-Flores v. Comprehensive Health Care & Rehab. Servs., LLC, 2014 WL 4954629, at *9 (E.D.N.Y. Oct. 2,

2014).

Although Shpigel entered into a partnership with the
impostor Dickerman and a third attorney, that agreement referred
to her as an "associate" and granted her only 15% of the profits
from cases.  Shpigel's five years of experience place her
between a junior and senior associate.  The paucity of
experience reflected in her Attorney Biography -- which
highlights, for instance, having "assisted in the research and
drafting of the complaint in [a] class action lawsuit" --
indicates that Shpigel is more akin to a junior than a senior
associate.  And here Shpigel was not supervised by a more senior
attorney.  Her supervisor, Dickerman, was in fact an impostor
only posing as a lawyer.  Accordingly, an hourly rate of $100,
at the lowest end of the range for a supervised junior
associate, is appropriate.  With a 111.7 reasonably billable
hours, the pre-adjustment lodestar figure here is $11,700.
Shpigel has not requested that a multiplier be applied.

A comparison of this lodestar figure to the $6,000 award
calculated under the percentage-of-fund method confirms the
reasonableness of the award.  The $6,000 fee award is
approximately 51% of this lodestar figure, which is appropriate
given the poor quality of representation and small contribution

to the creation of the Fund.

**III. Ippolitov's Fee Request**

Ippolitov requests a $10,000 case contribution award to compensate her for a retainer paid to Dickerman.  She has offered no evidence of this retainer apart from the bare statement that such payment was made in Shpigel's declaration. Ippolitov may submit, on or before November 7, 2014, documentary evidence of her payment to Dickerman of any retainer.

CONCLUSION

The Ippolitov Plaintiffs' August 22, 2014 motion for fees is granted in part.  $6,000 from the Fund is awarded to Shpigel, and the Court reserves judgment as to reimbursement for legal fees paid by Ippolitov to Dickerman, pending the submission of documentary evidence concerning such payments on or before November 7, 2014.


Dated:    New York, New York
          October 28, 2014

                              _____
                                  DENISE COTE
                         United States District Judge